IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2010

## MATTHEW R. HAKODA v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004-B-1212    Steve Dozier, Judge**

---

**No. M2009-01152-CCA-R3-PC - Filed November 30, 2010**

---

Petitioner, Matthew R. Hakoda, appeals the post-conviction court's dismissal of his petition for post-conviction relief in which he alleged the ineffective assistance of counsel at trial and on appeal. After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

J. David Wicker, Jr., Nashville, Tennessee, for the appellant, Matthew R. Hakoda.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Amy H. Eisenbeck, Assistant District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

Following a jury trial, Petitioner was convicted of three counts of solicitation of first degree murder, a Class B felony, and the trial court sentenced Petitioner as a Range I, standard offender, to an effective sentence of twenty-nine years. The facts surrounding Petitioner's convictions were summarized by this Court on appeal as follows:

> The defendant was charged with soliciting fellow jail inmate, Joseph
> Chamberlain, to murder his wife and her two children. At the trial,

Investigator Kevin Carroll with the Davidson County Sheriff's Department testified that every telephone call made by jail inmates was recorded in the normal course of business. He said the defendant was housed at the Davidson County Correctional Work Center (CWC) on January 27, 2004. The state introduced excerpts of three telephone calls the defendant made to his mother on January 27. In the first excerpt, from a conversation at 8:32 a.m., the defendant told his mother to write down a series of items that he wanted. He told her, "I want one to do deer with, one to do quail with ... one to do defense with, home defense ... one to hose down [a] car with." The defendant told his mother that he hoped she could "figure this out." The defendant also instructed his mother that he would "need all the bells and whistles to go with those."

In the second excerpt, from a telephone call made at 5:20 p.m., the defendant's mother reminded the defendant that the telephone calls were being recorded. During this conversation, the defendant expressed anger and instructed his mother to "put the smack down where it needs to be put down." He also instructed her to get his "garbage" and to give it to his girlfriend, Scarla. The defendant's mother assured him that "we've got everything taken care of." They also talked about family members, including his two brothers, and how they were "taking all this." The defendant again stated that he hoped they were "on track," to which his mother responded, "It doesn't take a rocket scientist to put ... puzzles together." The defendant talked about getting his "business" out of the house, and his mother stated that she would put a gun in the trunk and ammunition in the glove box of a car. His mother also stated that, "as far as I'm concerned, I don't have a f-ing sister ." The second excerpt ends with the defendant stating that "hopefully come Sunday, we'll mourn together about the loss of family members."

During the third excerpted conversation, from a telephone call made at 7:14 p.m., the defendant told his mother to "transfer the goodies" and to take possession of cash. He spoke repeatedly of a "goody bag" and told his mother to use telephones "that aren't ... you know." The defendant got angry with his mother, who did not immediately understand his directions, and he told her that she was "so slow."

Next, Joseph Chamberlain testified that he was an inmate at CWC on January 28, 2004. He testified that while working in the kitchen on that day, the defendant approached him and asked if Chamberlain "could get a

-2-

job done for him." Chamberlain stated that the defendant explained that he wanted his stepchildren and possibly his wife killed. Chamberlain said the defendant was particularly interested in having the two children killed because "it would devastate the mother." He testified that the defendant did not tell him how he wanted the killings accomplished but that the defendant did tell him about weapons that he had, including a .22 caliber handgun with a silencer, which the defendant referred to as "a pea-shooter with a muffler," and a .45 caliber gun that the defendant did not want to use because it was registered in the defendant's name.

According to Chamberlain, the defendant also said he wanted the killings done before the defendant was released from jail, so he could have an alibi and because "he was already under investigation and being watched for a ... previous fire and stalking." Chamberlain said that he told the defendant he would help because he was afraid the defendant would find somebody else to do it and that he asked the defendant to provide him with information on the victims. He stated that he had no intention of actually helping the defendant and that he immediately told his "pod counselor" about his conversation with the defendant.

Chamberlain testified that two days after this initial encounter, the defendant again approached him. The defendant gave him a piece of paper, which was introduced into evidence, with handwritten personal information about the defendant's wife, including her full name, social security number, date of birth, place of employment, vehicle description, license plate number, and physical description. The paper also included information about his wife's two children, including where they went to school. The note stated, "The children definitely need to be taken care of at all costs, because they're so precious." The note also contained information about the defendant, including his date of birth, social security number, address, and cellular telephone numbers. Chamberlain testified that on February 2, the defendant again approached him and asked if he had any guns for sale. He said the defendant discussed possible payment options, including a bond his mother was supposed to sign, some appliances the defendant had in storage, and a litter of puppies. He said that they talked about possible installment payments but that no set amount was ever determined. Chamberlain said the defendant repeated that he definitely wanted the children killed but that he possibly wanted the wife hurt or maimed, perhaps through the use of acid.

Chamberlain testified that the next time he met with the defendant was on February 3 and that he had worn a "wire" provided by the police. He said the defendant appeared suspicious of him and did not provide much information. He also stated that the transmitting and recording devices did not work and that authorities were unable to hear his conversation with the defendant. Chamberlain testified that he spoke to the defendant briefly on two other occasions. He said the defendant was angry at the lack of progress with his request. He said the defendant told him that the police had searched his aunt's house, where he was previously living, and had found his .45 caliber gun. The defendant also told him that the .22 caliber pistol was in a shed on a neighbor's property that was guarded by a pit bull. Chamberlain testified that the police informed him that he would not get out of jail any sooner or receive any other help as a result of his cooperation in the defendant's case. He stated that, in fact, jail life became more difficult for him afterward, as he was labeled a "snitch" by other inmates and was taken out of communal facilities.

On cross-examination, the defense questioned Chamberlain about apparent inconsistencies between his current testimony and his testimony at the preliminary hearing. Chamberlain admitted that at the preliminary hearing, he stated that the first time the defendant told him he wanted to kill the children was January 30, not January 28. Chamberlain said he was mistaken during the preliminary hearing. He testified that the defendant had approached him because he had a reputation for knowing "how to clear out a party," based on a previous incident when he informed a friend to call the police to stop a party. Chamberlain testified that he was previously in jail because he had not paid child support and that when the defendant initially approached him, the defendant only had thirteen days left of his jail sentence whereas Chamberlain was not scheduled for release for another five months. Chamberlain said he led the defendant to believe that his attorneys and his brother were working to get him out early. The defense also questioned Chamberlain on the methods of payment proposed by the defendant, and Chamberlain stated that he knew the defendant was unemployed.

Officer William Kirby of the Metropolitan Nashville Police Department testified that he examined and located latent fingerprints on the paper allegedly written by the defendant and given to Chamberlain. Linda Wilson, an Identification Analyst with Metro Police, was qualified as an expert in fingerprint identification. She testified that she identified four

-4-

latent fingerprints on the paper as belonging to the defendant. Metro Police Detective Timothy Sneed, with the Domestic Violence Division, testified that he spoke with staff at CWC and with Chamberlain about the allegations against the defendant. He said he informed Chamberlain that the police department could not assist him with getting out of jail early. He said Chamberlain's written statements were consistent with his interviews. He stated that through a search warrant based on information provided by Chamberlain, he found the .45 caliber gun in the defendant's aunt's house and a magazine for a .45 caliber gun in a shed in the defendant's aunt's yard which was guarded by a pit bull. Sneed also said the defendant was suspected in the burning of the defendant's wife's house.

On cross-examination, Detective Sneed testified that the police did not find a .22 caliber gun during their searches. He stated that he did not question any jail inmates other than Chamberlain. He said that he knew the defendant was "about to get out" of jail by the time he became involved in the investigation and that Chamberlain had approximately five months left to serve. He testified that there was nothing in the note written by the defendant and given to Chamberlain that indicated a murder was to take place or a price, location, date, or method for a murder. He said he did not interview the defendant's mother or charge her with any crime in connection with the alleged solicitation. He stated that he learned that the defendant had attempted to hire a private investigator but that he did not follow up on that information. On re-direct examination, Detective Sneed stated that Joseph Chamberlain was not a private investigator and that it would violate an order of protection to keep observation or make contact with the protected party through a third person.

The defendant's wife, Ruth Dren-Hakoda, testified that she and the defendant married in 1999, divorced, and remarried in 2001. She filed for a second divorce in 2003. She stated that she obtained an order of protection against the defendant in September 2003 and that she saw the defendant on her property in violation of the order several times. She said the information about her and her children given by the defendant to Chamberlain was correct, with the exception of her height. She identified the handwriting on the paper as belonging to the defendant. She said that after hearing of the allegations in the present case, she and her children went into hiding out of fear for their safety. She said the defendant owned a .45 caliber handgun and a .22 caliber gun, and she believed the latter was registered in her name. As to appliances in the defendant's possession, she

said he had a refrigerator. She also said he had pit pulls that he bred and whose puppies he sold for anywhere between $100 and $250.

On cross-examination, Ms. Dren-Hakoda testified that the defendant did not touch her on the occasions that he violated the protective order. She said she never told police that he threatened to kill or harm her or her children. She did say, however, that she felt threatened by the defendant.

The defendant's mother, Debbie Keller, testified for the defendant. She discussed the excerpted telephone conversations with her son that were previously submitted into evidence. She said that while her son was in jail, she talked to him on the telephone multiple times a day for approximately fifteen minutes at a time, for a total of at least thirty hours. She explained that in the January 27, 8:32 a.m. conversation, she understood that her son was asking her for needles. She said the defendant liked to sew and had a deerskin that he planned to make into moccasin boots. She said "quails" were items used to decorate the boots. She said she thought her son was also talking about a hose needed for a carwash and did not know what he meant by "home defense." She said that the defendant had awakened her from sleep and that she just pretended to understand and write down what he said in order to go back to sleep. She said that she did not think he was talking in a code and that he was not talking about guns. She said that during the 7:14 p.m. conversation, the defendant was instructing her to speak to a bondsman about getting a friend out of jail. She said she understood only part of what the defendant was saying. She said she understood that "goody bag" referred to money for the bond. She also testified that during the 5:20 p.m. conversation, she and her son were talking about strained family relationships. She said her sister Carol, in whose house she was living, was unhappy about the police coming to her house because of the defendant. She said "smack down" was a wrestling term and a figure of speech that the defendant only used as a joke. She said the "garbage" the defendant referred to were his clothes that he wanted removed from Carol's house. She said that the defendant wanted her to get some guns out of Carol's house but that she did not do so. She said that the defendant had recently had a falling out with his brother Benji and that the comment about mourning the loss of family members referred to his conflict with Benji and her plan to cut off ties with Carol.

Ms. Keller also testified that the three tapes played for the jury were not the complete conversations that she had with the defendant, although she could

-6-

not remember what else was discussed. She said the only appliances the defendant had were an old homemade computer, a non-functioning television set, and a hand saw. She said that the defendant never threatened his wife and that he cared about his step-children. On cross-examination, Ms. Keller stated that she did not know to what the $6000 to $8000 the defendant discussed with her referred and that she sometimes only pretended to understand her son. She later said the large sum of money was for a down payment on a house. She said she did not know what her son's reference to "carwash" or "home defense" meant.

Mario Hambrick, a bail bondsman, testified that he had worked with the defendant several times. He said that after a conversation with the defendant, he had given the defendant telephone numbers for two private investigators. Tommy Jacobs, a retired police officer and professional private investigator, testified that, in his experience, it is common for people involved in divorces to hire private investigators. He testified that a private investigator would need information from a client about the person to be investigated, such as the person's name, address, place and hours of employment, and frequented locations. He said it would be important to have information on any children involved, including where they went to school.

*State v. Matthew R. Hakoda*, No. M2005-01864-CCA-R3-CD, 2006 WL 2738881, at *1-5 (Tenn. Crim. App., at Nashville, Sept. 21, 2006), *perm. to appeal denied* (Tenn. Oct. 27, 2008).

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner testified that he and trial counsel "met several times, to go over stuff." Petitioner stated that he and counsel were aware that the public defender's office had approximately forty hours of Petitioner's taped telephone conversations with his mother on DVD, but trial counsel did not receive a copy of the DVD until the night before a scheduled hearing. Petitioner acknowledged that trial counsel moved for a continuance at the hearing in order to have time to review the DVD, and the trial court denied her motion. Petitioner stated that he did not believe that trial counsel had ever reviewed the taped conversations in their entirety. Petitioner said that he and trial counsel never discussed a trial strategy. Trial counsel advised Petitioner not to testify at trial because the State "didn't [sic] have a case and that it would probably be detrimental for [him] to take the stand." Petitioner said that he understood the elements of the offense of solicitation of

first degree murder, but he did not understand the concept of "mens rea." Petitioner stated that trial counsel did not challenge the trial court's sentencing determinations on appeal.

Petitioner said that at the time the offenses were committed, he was serving twenty days for various violations of an order of protection. Petitioner explained that he told Mr. Chamberlain that the violations were a "set up," and he wanted Mr. Chamberlain to hire a private investigator so that Petitioner could find the witness who said that he had committed the violations. Petitioner stated that he gave Mr. Chamberlain the personal information about his wife and step-children to assist the private investigator. Instead, Mr. Chamberlain told the law enforcement officials that Petitioner "was trying to hire him to do a hit." Petitioner stated, however, that Mr. Chamberlain told the police that Petitioner had renounced the solicitation plan. Petitioner said that Mr. Chamberlain told the police about the plan to murder Petitioner's wife and step-children in order to have Mr. Chamberlain's sentence of six months reduced. Petitioner stated that other inmates were in the kitchen when he spoke with Mr. Chamberlain, but trial counsel did not interview them prior to trial. Petitioner acknowledged that his theory of defense, that he was only trying to hire a private investigator, was presented at trial.

On cross-examination, Petitioner acknowledged that he and trial counsel reviewed the transcripts of the portions of his taped telephone conversations which the State intended to introduce at trial. Petitioner also acknowledged that he did not know the names of his fellow inmates who were in the kitchen when he spoke to Mr. Chamberlain. Petitioner stated that he chose not to testify at trial, but he explained that was "at that time." Petitioner said that the excerpts of his taped telephone conversations to his mother were taken out of context. He stated that his statements about mourning family members and his use of the phrase "smack down" were just "figures of speech." Petitioner said that the money mentioned during the conversations concerned the amount of a bond his mother was to obtain for a fellow inmate. On redirect examination, Petitioner stated that he and trial counsel did not review the telephone conversations until the day of trial.

Trial counsel testified that she had worked in the Public Defender's Office for five years before entering private practice five or six years prior to the post-conviction hearing. Trial counsel stated that approximately ninety percent of her private practice involved criminal cases. Trial counsel said that she and Petitioner discussed trial strategy on numerous occasions. Petitioner's defense was that he was asking Mr. Chamberlain's assistance in finding a private investigator. Trial counsel stated that she emphasized during opening argument that the State had "jumped to conclusions" in charging Petitioner with the offenses, and that the evidence would not show that Petitioner had the requisite intent to murder his wife and stepchildren. Trial counsel acknowledged that she did not object to the State's reference during opening argument to a charge of aggravated arson against Petitioner

that was pending at the time of trial. Trial counsel stated that a hearing had been conducted prior to trial after which the trial court found that the fact that Petitioner had been charged with arson in connection with the burning of his wife's house was admissible under Rule 404(b) of the Tennessee Rules of Evidence. The trial court also found, however, that the circumstances surrounding the arson charge was inadmissible.

Trial counsel said at the post-conviction hearing that she did not receive the entire taped telephone conversations between Petitioner and his mother until the day before trial. (We note that the transcript of the hearing on trial counsel's motion to continue reflects that trial counsel received the DVD of the telephone conversations on March 31, 2005, the day before the hearing and four days before trial.) Trial counsel considered the excerpts of the telephone conversation which were played for the jury damaging because of the tone of Petitioner's voice and his demeanor during the conversation. Trial counsel brought out at trial that the jury was not hearing the complete conversations, and the excerpts had been taken out of context. Trial counsel said that she reviewed with Petitioner "numerous times," Mr. Chamberlain's letters, statement to the police, and preliminary hearing testimony. Trial counsel stated that she also reviewed the excerpts of the taped telephone conversations with Ms. Keller prior to trial. Trial counsel said that if she had felt there were any issues pertaining to sentencing that could have been raised on appeal, she would have done so.

## III. Standard of Review

To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-210(f). However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id.; State v. Burns,* 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he or she must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he or she must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S. Ct. at

2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id*. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his or her counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id*. Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

## IV. Opening Statements

Petitioner argues that trial counsel's assistance was deficient because she failed to object to the prosecutor's statement during opening statements that Petitioner told Mr. Chamberlain to commit the solicitation offenses while Petitioner was still in jail "so that he could have an alibi, because he was suspected of burning his wife's house down." Petitioner also points out that trial counsel did not ask for a curative instruction to the jury concerning the reference to prior bad acts.

Trial counsel testified that she did not object to the arson reference because the trial court had ruled the evidence admissible prior to trial. Furthermore, although trial counsel did not preserve the issue for appellate review by failing to object to the comment, this Court nonetheless addressed Petitioner's claim on appeal that the reference constituted prosecutorial misconduct. On appeal, we concluded that "[r]egardless of any waiver, this issue does not warrant reversal. The prosecutor's statement was a reference to evidence that, as discussed above, while not properly admitted, was harmless." *Matthew R. Hakoda*, 2006 WL 273881 at *10. It is well-established that post-conviction proceedings may not be employed to raise and re-litigate issues previously determined on direct appeal. *Roy E. Keough v. State*, No. W2008-01916-CCA-R3-PD, 2010 WL 2612937, at *38 (Tenn. Crim. App., at Jackson, June 30, 2010) (citing *Miller v. State*, 54 S.W.3d 743, 747-48 (Tenn. 2001)). Accordingly, we conclude that Petitioner is not entitled to relief on this ground.

Petitioner also argues that trial counsel's opening statement was deficient because she failed to "name a single witness," address the State's burden of proof and the elements of the offense, and present Petitioner's "version of the facts." The right to effective assistance of counsel extends to opening and closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); *Bell v. Cone*, 535 U.S. 685, 701-02, 122 S.Ct. 1843 (2002). Nonetheless, counsel has wide latitude in deciding how best to represent a client, and

deference to counsel's tactical decisions in his or her opening or closing argument is particularly important.

In her opening statement, trial counsel stressed the fact that the State had "jumped to conclusion [sic]" based on the statement of one witness. Trial counsel urged the jury to consider whether Mr. Chamberlain's testimony was reasonable or even logical. Trial counsel outlined what the State's evidence would not show, and posited that the evidence instead would support Petitioner's position that he was going through a divorce and was only attempting to find a private investigator. Although trial counsel's arguments failed to set forth any facts of the crimes or the elements of the offense the State was required to prove, the evidence does not preponderate against the post-conviction court's finding that the composition of trial counsel's opening argument was a tactical decision not subject to hindsight review. Moreover, we conclude that Petitioner has failed to show that had trial counsel presented a different opening argument, a different result would have occurred. Petitioner is not entitled to relief on this claim.

## V. Admission of the Taped Telephone Conversations

Petitioner argues that trial counsel's assistance was ineffective because she failed to object to the introduction at trial of the taped excerpts of Petitioner's telephone conversations with his mother while Petitioner was in jail. Citing *State v. Jones*, 598 S.W.2d 209, 223 (Tenn. Crim. App. 1980), *superseded by statute on other grounds as stated in State v. Shropshire*, 874 S.W.2d 634, 638 (Tenn. Crim. App. 1993), Petitioner also contends that trial counsel's assistance was deficient because she failed to request a limiting instruction to the jury "that only the statements, admissions, and declarations of [Petitioner] in the taped conversations may be considered."

Petitioner's first contention, trial counsel's failure to object, was addressed by this Court on direct appeal. Based on our review, we concluded that Petitioner had failed to establish that he was unfairly prejudiced by the introductions of the taped excerpts. *Matthew R. Hakoda*, 2006 WL 2738881, at *8. Thus, Petitioner is not entitled to relief on this claim. *See* T.C.A. § 40-30-106(h). Petitioner's second contention, trial counsel's failure to request a limiting instruction to the jury, was also raised in his direct appeal but was found waived by this Court. *Matthew R. Hakoda*, 2006 WL 2738881, at *8 (citing Tenn. R. App. P. 3(e), 36(a); *State v. Howell*, 868 S.W.2d 238, 255-56 (Tenn. 1993); *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)) (noting that trial counsel did not request an instruction and failed to raise the issue in her motion for new trial).

Nonetheless, Petitioner has failed to show that he was prejudiced by the omission. Trial counsel testified at the post-conviction hearing that she brought out on cross-

examination the fact that the tapes did not portray Petitioner's entire conversations with his mother. Petitioner called Ms. Keller at trial as a defense witness to explain the context in which the statements were made. Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel's conduct was not deficient in this regard.

## VI. Expert Testimony

Petitioner argues that trial counsel's conduct fell below the standard expected of defense counsel when she failed to consult with a fingerprint expert prior to trial and failed to cross-examine the State's expert witness. At trial, Officer Linda Wilson, an identification analyst with the Metro Nashville Police Department, testified that the four latent fingerprints lifted from a note containing personal information about Petitioner's wife and stepchildren belonged to Petitioner. *Matthew R. Hakoda*, 2006 WL 2738881, at *3. Trial counsel testified at the post-conviction hearing that there was no reason to hire a fingerprint expert because Petitioner did not deny that he had written the information for Mr. Chamberlain, and it was Petitioner's defense theory at trial that he had provided this information so that Mr. Chamberlain could give it to a private investigator. Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner has failed to show that his trial counsel's conduct was deficient or that he was prejudiced by trial counsel's failure to consult an expert before trial or cross-examine Officer Wilson at trial. Petitioner is not entitled to relief on this issue.

## VII. Cross-examination of Mr. Chamberlain

Petitioner argues that trial counsel's assistance was ineffective during Mr. Chamberlain's cross-examination. Petitioner acknowledges that trial counsel highlighted the inconsistencies between Mr. Chamberlain's trial testimony, preliminary hearing testimony, and his statement to the police, but contends generally that "counsel failed to make numerous obvious points that would have undermined the substance of Mr. Chamberlain's testimony." Petitioner does not state in his brief what those "obvious points" might have been. Trial counsel stated at the post-conviction hearing that she thoroughly cross-examined Mr. Chamberlain concerning his inconsistent statements and the trial transcript so reflects. Based on our review, we conclude that Petitioner has failed to establish that trial counsel's assistance was deficient in this regard.

Petitioner also argues that trial counsel's assistance was ineffective because she failed to interview prior to trial any kitchen workers who may have been present during Petitioner's conversations with Mr. Chamberlain. Trial counsel at the post-conviction hearing stated that she had no recollection of Petitioner asking her to locate any specific

witnesses. Petitioner did not call any witnesses at the post-conviction hearing to establish what information, if any, the witnesses may have had about the conversations or even that such witnesses existed. Accordingly Petitioner has failed to establish any prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (when a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing). Petitioner is not entitled to relief on this ground.

## VIII. Failure to Review the Taped Conversations in their Entirety

Petitioner argues that trial counsel's assistance was ineffective because she failed to request from the State the approximately forty hours of taped telephone conversations between Petitioner and his mother until a week before trial. At the post-conviction hearing, trial counsel explained that Petitioner was initially represented by the Public Defender's Office. Trial counsel believed that she had received all of the public defender's file after she had been retained to represent Petitioner. When she realized that she had not received the DVD containing the entire taped telephone conversations, trial counsel filed a motion for a continuance which was denied by the trial court. Trial counsel stated that she received the taped conversations from the State the afternoon before trial and reviewed the recordings prior to trial. However, as noted above, the record indicates that trial counsel received the DVD at issue the day before the hearing on her motion to continue, or four days before trial.

Nonetheless, trial counsel was provided transcripts of the excerpts the State intended to introduce at trial, and she reviewed the transcripts with both Petitioner and Ms. Keller. Petitioner did not offer any proof at the post-conviction hearing as to the existence of any exculpatory information in the unredacted portion of the telephone conversation, or that having more time to review the DVD would have benefitted his defense. Accordingly, we conclude that Petitioner has failed to show that he was prejudiced by trial counsel's delay in receiving the tape of Petitioner's entire telephone conversations with his mother. Petitioner is not entitled to relief on this issue.

## IX. Requisite Intent

Petitioner argues that trial counsel failed "to highlight" the factors negating a finding that Petitioner intended to solicit Mr. Chamberlain to murder his wife and stepchildren. Petitioner acknowledges that trial counsel's closing argument focused on the inconsistencies between Mr. Chamberlain's pre-trial statements and testimony and that presented at trial. Petitioner, however, contends that trial counsel did not do that "in any substantive way that would support any defense theory." Petitioner concludes, therefore, that trial counsel abandoned his theory of defense after Mr. Chamberlain's testimony.

The post-conviction court found credible trial counsel's testimony that she developed a theory of defense based on Petitioner's intention to hire a private investigator and not a murderer, and that she discussed this theory with both Petitioner and Ms. Keller prior to trial. Trial counsel thoroughly cross-examined Mr. Chamberlain, stressing the fact that Petitioner, who allegedly wanted the murders committed before he was released from jail in thirteen days, knew that Mr. Chamberlain was not scheduled to be released for another five months. Trial counsel continued this theme in her closing argument, including such factors as Mr. Chamberlain's testimonial inconsistencies, his acknowledgment that a total fee for the murders was never discussed, that he knew Petitioner did not have a job, the fact that the investigating officers did not locate a .22 caliber handgun in the location described by Mr. Chamberlain, and the fact that only excerpts from Petitioner's taped telephone conversations had been played for the jury.

Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555 (1975). Judicial review of a defense attorney's summation is therefore highly deferential. *Yarbrough* 540 U.S. at 5-6, 124 S. Ct. at 4.

Based on our review, we conclude that Petitioner has failed to establish that either trial counsel's cross-examination of Mr. Chamberlain or her closing argument fell below reasonable standards of representation. Petitioner is not entitled to relief on this issue.

## X. Failure to Challenge Sentence

Petitioner argues that trial counsel's assistance was ineffective because she failed to object at the sentencing hearing to the trial court's use of enhancement factors to determine the length of Petitioner's sentence in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and failed to appeal the issue. In June 2004, the United States Supreme Court held in *Blakely* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 542 U.S. at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348 (2000)).

Following *Blakely*, the Tennessee Supreme Court, in an opinion issued on April 15, 2005, concluded that the Tennessee Sentencing Reform Act of 1989 did not impermissibly infringe on the province of the jury in violation of a defendant's Sixth Amendment right to jury trial. *State v. Gomez*, 163 S.W.3d 632, 661 (Tenn. 2005) ("*Gomez I*"). Thereafter, the United States Supreme Court vacated the decision in *Gomez I* and remanded for reconsideration in light of its decision in *Cunningham v. California*, 549 U.S. 270, 127 S.

-14-

Ct. 856 (2007). On remand, our supreme court held on October 9, 2007, that a trial court's enhancement of a defendant's sentence on the basis of judicially determined facts other than the defendant's prior convictions violates the defendant's Sixth Amendment rights. *State v. Gomez*, 239 S.W.3d 733, 740-41 (Tenn. 2007) ("*Gomez II*").

Defendant's offenses occurred in January 2004 before the issuance of *Blakely*. Although Defendant's sentencing hearing on May 20, 2005, was held after *Blakely*, *Gomez I*, finding Tennessee's sentencing scheme constitutional, was the controlling law. This Court issued the opinion on Petitioner's direct appeal on September 21, 2006, and *Gomez II* was not filed until October 9, 2007. Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel's performance was not deficient for failing to anticipate a change in the law as it existed in Tennessee at the time of Petitioner's direct appeal. *See State v. Jeffrey Walters*, No. M2008-01806-CCA-R3-PC, 2009 WL 3400687, at *6 (Tenn. Crim. App., at Nashville, Oct. 20, 2009). Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-15-